Anthony HERBERT, Plaintiff,

v.

Barry LANDO et al., Defendants.

No. 74 Civ. 434–CSH.

United States District Court, S. D. New York.

Jan. 4, 1977.

390

Cohn, Glickstein, Lurie, Ostrin & Lubell, New York City, for plaintiff.

Coudert Brothers, New York City, for defendants Mike Wallace and CBS Inc.

Green & Hillman, New York City, for defendant Barry Lando.

Rembar, Wolf & Curtis, New York City, Choate, Hall & Stewart, Boston, Mass., for defendant Atlantic Monthly Co.

## MEMORANDUM AND ORDER

HAIGHT, District Judge:

Plaintiff in this defamation action seeks an order compelling discovery pursuant to Rule 37(a)(2), F.R.C.P. Defendants vigorously resist the motion. The case presents interesting questions, one of which, insofar as the excellent briefs of counsel and the Court's own research indicate, is one of first impression. That question is:

Within the context of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny, and the heavy burdens of proof they place upon

"public figure" plaintiffs in defamation actions, what are the proper boundaries of pre-trial discovery?

## I.

The plaintiff is Lieutenant Colonel Anthony B. Herbert (U.S. Army, Ret.) ("Herbert"). He has brought an action for defamation against defendants Columbia Broadcasting System, Inc. ("CBS"), Mike Wallace ("Wallace"), Barry Lando ("Lando") and Atlantic Monthly Company ("Atlantic"). The subjects of the action are a broadcast presented by CBS on its 60 MINUTES Program, produced by Wallace and Lando, and an article subsequently published by Atlantic and written by Lando.

Herbert alleges that both the program and the article maliciously portrayed him as a liar, one who had committed acts of brutality and atrocities in Viet Nam and an opportunist seeking to use the war crimes issue to cover his own alleged failures in the Army.

Col. Herbert, a much-decorated Army officer, was stationed in Viet Nam from September, 1968 until early April, 1969, first as Acting Inspector General for the 173rd Airborne Brigade and thereafter as Commanding Officer of the 2nd Battalion of the Brigade until he was relieved of his command on April 4, 1969. Herbert has consistently contended that, while in Viet Nam with the 173rd Brigade, he observed and was distressed by many war crimes and atrocities, committed by American troops. According to Herbert's account, he reported these events to his superior officers, a Col. Franklin and a General Barnes; and, when these officers took no action in respect of Herbert's reports, Herbert brought formal charges against Franklin and Barnes. These charges resulted in an investigation by the Army, the results of which are not material to this motion.

During the course of these activities, Col. Herbert received considerable publicity. It is conceded that, in consequence, Herbert is a "public figure" as defined by the United States Supreme Court in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), and more recently in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 345, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974):

> "Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures . . .
>
> "For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment."

On February 4, 1973 CBS broadcast a program in its television series 60 MINUTES. A major segment of that telecast concerned Col. Herbert. Herbert alleges in this suit that the program falsely and maliciously portrayed him as a liar in his assertions that he had reported atrocities to Col. Franklin or General Barnes; as a man capable of brutality to Vietnamese prisoners; and as a person who had used the war crimes charges against his superior officers as an excuse for his own relief from command.

Defendant Lando was the producer of the telecast in question; defendant Wallace was the narrator and one of the interviewers. In its May, 1973 issue, defendant Atlantic published an article by Lando about Herbert, which discusses the 60 MINUTES Program, Lando's activities in producing the program, and a book which Herbert had written entitled "Soldier". Herbert puts forward comparable allegations of defamation in respect of the Atlantic article.

■ The defendants deny that the statements concerning Herbert appearing in the telecast or the article are false. In addition, defendants deny knowledge of any falsity that may be present, or that they

proceeded with reckless disregard of truth or falsity. Thus defendants, as they are of course entitled to do, cast upon Herbert the onerous burden of proof that applies in cases of this nature, as summarized recently by the Second Circuit in *Buckley v. Littell,* 539 F.2d 882, 889–890 (2d Cir. 1976):

> "The appellee, a public figure, must rather have demonstrated with convincing clarity not only that the appellant's statements were false, but that appellant knew they were false or made them with reckless disregard of their truth or falsity."

## II.

Herbert has launched extensive pre-trial discovery, including the taking of depositions of the defendants and notices to produce documents pursuant to Rule 34. Numerous disputes arose, both in respect of answering questions on depositions and producing documents. Counsel for the parties worked effectively and in a good spirit of cooperation to narrow the areas of dispute. Additional issues were resolved by the Court following a hearing. At that hearing, the remaining areas of dispute were reserved for decision, following the submission by counsel of further memoranda. Those remaining disputes will be considered in this opinion.

## III.

Many of the issues arise out of the deposition of defendant Lando, the producer of the 60 MINUTES telecast and the author of the Atlantic article. Upon a number of occasions, counsel for Lando instructed him not to answer questions posed by counsel for Herbert. Herbert now seeks an order compelling answers to those questions.

The questions involved are numerous, and will not be set forth here. They may for convenience be separated into areas of inquiry, which the main brief for defendants CBS, Wallace and Lando (pp. 2–3) accurately summarizes as follows:

> "1. Lando's conclusions during his research and investigation regarding people or leads to be pursued, or not to be pursued, in connection with the '60 Minutes' segment and the *Atlantic Monthly* article;
>
> "2. Lando's conclusions about facts imparted by interviewees and his state of mind with respect to veracity of persons interviewed;
>
> "3. The basis for conclusions where Lando testified that he did reach a conclusion with respect to persons, information or events;
>
> "4. Conversations between Lando and Wallace about matter to be included or excluded from the broadcast publication;
>
> "5. Lando's intentions as manifested by the decision to include or exclude material;
>
> "6. Conversations between Lando and source persons subsequent to the inception of this action;
>
> "7. Lando's activities as well as conversations between Lando, Wallace and/or other CBS employees concerning Herbert or the '60 Minutes' segment between broadcast and publication of the Atlantic Monthly article."

In addition, disputes exist with respect to Herbert's following discovery demands:

1. Production of a CBS memorandum prepared by a CBS "house" attorney in response to an inquiry made by Lando, under circumstances to be discussed below.

2. Questions and demands concerning communications between Atlantic and its counsel involving Lando's manuscript and the article which ultimately appeared in Atlantic.

3. Herbert also demands production of documents in the possession of CBS, Wallace or Lando during stated periods of time, regarding Herbert, the 173rd Airborne Brigade while in Viet Nam, individuals appearing or referred to on the 60 MINUTES segment, and the events described in Herbert's book "Soldier", and documents relating to communications or correspondence with Herbert's literary agent, the publishers of his book, and employees of Atlantic

concerning Herbert, his charges, the truth and accuracy of the 60 MINUTES segment, or any individual appearing or quoted thereon. The particular area of dispute in respect of this documentation concerns production of such documents that were in the possession of the parties indicated at the stated times, but which were not specifically known to Wallace or Lando at the time the telecast was being produced.

These areas of dispute will be considered in order. Preliminarily, however, it is necessary to consider in greater detail what plaintiff must prove in order to recover. That question is inextricably interwoven with the proper boundaries of pre-trial discovery.

### IV.

Defendants rely upon their First Amendment guarantee of the freedom of speech, with particular reference to "public figures". In *Goldwater v. Ginzburg,* 414 F.2d 324, 335 (2d Cir. 1969), the Second Circuit stated succinctly:

"False statements are protected only if they are honestly made."

That is a distillation of the Supreme Court's holding in *Garrison v. Louisiana,* 379 U.S. 64–75–6, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964):

"Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection."

■ Thus there are two kinds of statements that are not protected:

(1) the *knowingly false* statement; and
(2) the false statement *made with reckless disregard of the truth.*

These constitutionally unprotected creatures are obviously of different species. *Knowledge* of falsity is a necessary element of the first; that is not so in respect of the second. Identification of the first species turns upon an objective question of fact: did the defendant know the statement was false? Either he did or did not; if he did he is cast in damages; if he did not he is exonerated.

The second species of unprotected false statement is at once more subtle, complex and subjective. The concept of "reckless disregard for truth" inevitably carries the trier of the facts into the thought processes of the defendant: the evaluation and balancing he made of conflicting information available to him; the misgivings he may have suppressed when deciding to publish.

Thus the Supreme Court has defined false statements made in "reckless disregard for truth" as those made with "[a] high degree of awareness of their probable falsity", *Garrison v. Louisiana, supra,* at 74, 85 S.Ct. at 216. Mr. Justice Harlan's opinion in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 153, 87 S.Ct. 1975, 1991, 18 L.Ed.2d 1094 (1967) speaks of publication "despite the publisher's awareness of probable falsity." In *St. Amant v. Thompson,* 390 U.S. 727, 731, 732, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), Mr. Justice White said that reckless disregard is present if the publisher "in fact entertained serious doubts as to the truth of his publication", or where "there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports". In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 334 n. 6, 94 S.Ct. 2997, 3004, 111 L.Ed.2d 789 (1974), the Court noted that the *St. Amant* test "equated reckless disregard of the truth with subjective awareness of probable falsity . . ."

Whether or not the present defendants "entertained serious doubts" as to the truth of the statements about Herbert, or had a "subjective awareness of probable falsity", are questions of crucial relevance. No one disputes that. The question is how a plaintiff in Herbert's position proves such elements as doubt or awareness in the minds of the defendants—or, to be more precise within the context of the present motion, what discovery procedures he may legitimately summon to his aid.

### V.

The Court observed at the beginning of this opinion that the question presented is, in substantial part, one of first impression.

That is because, with a sole exception, the defamation cases cited in the briefs of counsel deal with the totality of the evidence adduced on the merits. That is to say, these cases arise on motions for summary judgment, or on motions or appeals after trial. Only one case focuses upon the appropriate boundaries of discovery within the context of a "public figure" defamation suit, and it is limited to discovery of documents.

That case is *Buckley v. Vidal*, 50 F.R.D. 271 (S.D.N.Y.1970), a decision by Judge Levet of this court. Plaintiff alleged that he had been defamed by the defendant's statements in television programs, and in articles appearing in magazines. The plaintiff sought production, under Rule 34, of a wide variety of manuscripts, correspondence, notes, memoranda and other material prepared by defendant or exchanged between defendant and the magazines and television station in question, editors, agents, or employees, or persons engaged as investigators by the defendant, or relating in any manner to the statements in suit. The defendant interposed First Amendment objections; and also argued that plaintiff had failed to show "good cause" for the production, and that certain of the documents were covered by the attorney-client privilege.

Judge Levet overruled the first two objections, and reserved his ruling on the third for an *in camera* examination of the documents as to which privilege was asserted. On the First Amendment point, he commented on the heavy burden of proof borne by a plaintiff in such cases, and viewed that burden as a basis for liberal pre-trial discovery:

> "In the case at bar, it seems that plaintiff is obligated to delve into the realm of defendant's conduct, motivation and belief in order to recover, at least with regard to statements directed to public conduct of the plaintiff.
>
> "Although in recent years the Supreme Court has placed stringent burden of proof requirements on a public official or public figure suing for defamation, such

plaintiffs may still recover if they sustain their heavy burdens. As long as a cause of action for defamation passes constitutional muster, a plaintiff must be allowed reasonable opportunity for discovery. Defendant's objection to production and inspection on broad First Amendment grounds is therefore overruled." 50 F.R.D. at 273–4.

On the "good cause" objection, the court said, in directing disclosure of material received by defendant concerning plaintiff for a period of six years prior to the publications in suit:

> "In light of the nature of this action and the burden of proof that may be imposed on plaintiff, as discussed above, I do not believe the 1962 date is too remote." 50 F.R.D. at 274.

■ In keeping with the rationale of *Buckley v. Vidal*, I conclude that a "public figure" plaintiff in a defamation action is entitled to liberal interpretation of the rules concerning pre-trial discovery. I intimate no view on the merits of the present case; but one cannot close one's eyes to the possibility of malicious publications or statements concerning public figures. If the malicious publisher is permitted to increase the weight of the injured plaintiff's already heavy burden of proof by a narrow and restricted application of the discovery rules, so that the plaintiff is denied discovery into areas which in the nature of the case lie solely with the defendant, then the law in effect provides an arras behind which malicious publication may go undetected and unpunished. Nothing in the First Amendment requires such a result.

■ There is another general principle applicable to this case in its present stage of development. Defendants argue in their briefs that many of the areas into which Herbert wishes to inquire would not constitute admissible evidence, in the light of the pertinent cases. Some of these contentions are considered further *infra*. But it may be noted generally that, under Rule 26(b)(1), F.R.C.P.:

> "It is not ground for objection that the information sought will be inadmissible

at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

Courts have given a broad scope to this language, which was added to the Rule by amendment. 4 *Moore's Federal Practice* (2d ed. 1976), ¶ 26.56[5] at p. 26–179. Judge Lumbard, concurring in *United States v. Matles*, 247 F.2d 378, 383 (2d Cir. 1957), *rev'd* on other grounds, 356 U.S. 256, 78 S.Ct. 712, 2 L.Ed.2d 741 said:

> "This language [Rule 26(b)] is clearly designed to be broad enough to cover almost anything that will help the examining party to discover any leads to evidence."

It is, of course, true that the matter as to which discovery is sought be "relevant" to the subject matter of the action. In the light of these principles, I turn to the particular areas of dispute.

### VI.

The first five areas of dispute, listed on page 392 *supra*, relate to Lando's conclusions, opinions and intentions, formulated during the period of time that he was researching and preparing the television program and the Atlantic article, with particular reference to people or leads to be pursued or not to be pursued, the veracity of persons interviewed, and the reasons why certain material was included or excluded. Lando was repeatedly instructed by counsel not to answer such questions during his deposition (the inquiries in question appear in Appendix A to defendants' main brief).

Defendants interpose a broad-scale objection to these lines of inquiry. They contend that inquiry into opinions, conclusions, the basis of conclusions, and intent cannot be permitted because it is irrelevant, constitutes a violation of First Amendment privilege and also the privilege of "editorial judgment".

I reject these contentions. Where, as here, the defendant's state of mind is of central importance to a proper resolution of the merits, it is obvious that these lines of inquiry may lead, directly or indirectly, to admissible evidence. As in all cases, civil or criminal, turning upon the state of an individual's mind, direct evidence may be rare; usually the trier of the facts is required to draw inferences of the state of mind at issue from surrounding acts, utterances, writings, or other indicia. In *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969), *cert. den.*, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695, the Court made this point forcibly in considering the trial judge's charge:

> "The trial court, appellants also argue, erroneously permitted the jury to find actual malice from evidence of negligence and ill will. The record is to the contrary. The court below not only charged the jury but also emphasized in the charge that neither negligence nor failure to investigate, on the one hand, nor ill will, bias, spite, nor prejudice, on the other, standing alone, were sufficient to establish either a knowledge of the falsity of, or a reckless disregard of, the truth or falsity of the materials used. Moreover, the court properly instructed the jurors that they should consider *all the evidence concerning appellants' acts and conduct* in publishing Fact in deliberating upon whether the defendants published with actual malice. There is no doubt that *evidence of negligence, of motive and of intent* may be adduced for the purpose of establishing, *by cumulation and by appropriate inferences*, the fact of a defendant's recklessness or of his knowledge of falsity. See, e. g., *Curtis Publishing Co. v. Butts*, supra." (emphasis added).

The publisher's opinions and conclusions with respect to veracity, reliability, and the preference of one source of information over another are clearly relevant. It is no answer for the defendants to say that they accurately repeated the words of certain of their interviewees. In *Goldwater v. Ginzburg*, supra, the Second Circuit observed:

> "Repetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, *or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his re-*

ports. *St. Amant v. Thompson*, supra [390 U.S.] at 732, 88 S.Ct. 1323." 414 F.2d at 337 (emphasis added).

The lines of inquiry under discussion are entirely appropriate to Herbert's efforts to discover whether Lando had any reason to doubt the veracity of certain of his sources, or, equally significant, to prefer the veracity of one source over another. It is quite apparent that Col. Herbert, at the times in question, was a controversial figure, highly regarded in certain quarters, but viewed with considerably less favor in others. Herbert is entitled to full discovery on these lines of inquiry. He is equally entitled to discovery on whether Lando's investigation and research was negligent, and the lines of inquiry under consideration bear upon this issue as well. Nothing in the *Times* case or its progeny holds that evidence of negligence can never be relevant or admissible on the issue of malice. The Second Circuit also makes this clear in *Goldwater v. Ginzburg*:

> "As already stated, supra, *Times* does not hold that evidence of negligence is inadmissible; it only holds that evidence which merely establishes negligence in failing to discover misstatements, without more, is constitutionally insufficient to support the finding of recklessness required to establish actual malice from proof of less than prudent conduct. Recklessness is, after all, only negligence raised to a higher power. To hold otherwise would require that plaintiff prove the ultimate fact of recklessness without being able to adduce proof of the underlying facts from which a jury could infer recklessness. It would limit successful suits to those cases in which there is direct proof by a party's admission of the ultimate fact, certainly a situation not intended by the Supreme Court. See *St. Amant v. Thompson*, supra, 390 U.S. at 732–733, 88 S.Ct. 1323." 414 F.2d at 343.

See also *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), and in particular the discussion under Point II, pp. 391–4, in which the Supreme Court considers the sort of activities, evaluations and opinions on the part of a publisher or its representatives which could permit the trier of the fact to draw the inference of reckless disregard of truth.

■ Finally, under this heading, I find no substance in the argument defendants base upon the "editorial judgment" concept. Cases such as *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) and *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), deal with statutes or regulations purporting to specify what newspapers or broadcasting stations must print or say. *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), deals with a newspaper reporter's obligation to respond to a grand jury subpoena and inquiry. These cases have nothing to do with the proper boundaries of pre-trial discovery in a defamation suit alleging malicious publication.

## VII.

Items 6 and 7 of the disputed issues (p. 392 *supra*) relate to conversations between Lando and source persons subsequent to the inception of the action; and to Lando's activities as well as conversations between Lando, Wallace or other CBS employees concerning Herbert or the television program, between broadcast and publication of the Atlantic Monthly article.

■ Defendants object to these lines of inquiry on the basis that inquiry into post-publication activities, writings or statements is irrelevant, and cannot possibly lead to the discovery of admissible evidence.

I cannot accept this latter proposition. As noted above, the case turns upon subjective aspects of the defendant's state of mind. To be sure, it is the state of mind at the time of publication that controls; but how can it reasonably be contended that post-publication statements or activities *could not* form the basis for an inference as to pre-publication state of mind? I do not say that such evidence will be adduced; I only hold that, under the discovery rules, Herbert is entitled to inquire. It is well

settled that statements after the act, stating the past intent or motive at the time of the act, are usable against a defendant as admissions. 6 *Wigmore on Evidence* (3rd ed. 1940) at § 1732, p. 103. See also *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1941) (alleged conspiracy on part of government prosecutors and private counsel to defraud United States in respect of prosecution of liquor cases; evidence was admitted that a defendant, one Roth, asked an Assistant United States Attorney to use his influence to stop the investigation; this evidence held admissible: "The statements of Roth were not in furtherance of the conspiracy, but they did tend to connect Roth with it by explaining his state of mind." 315 U.S. at 81–82, 62 S.Ct. at 470.) Compare *United States v. Matot,* 146 F.2d 197 (2d Cir. 1944) (in prosecution for bank fraud, where fraudulent intent was a necessary element of the crime, *held* it was error to exclude evidence of accused's subsequent interview with bank president, since conversation could be read as "confirmation of his denial that he had ever contemplated a fraud," 146 F.2d at 198).

 Furthermore, in the case at bar defendant Lando was directly concerned with two publications: the television broadcast on February 4, 1973, and the Atlantic article in May, 1973. Obviously, the activities of Lando during this interim period of time are relevant. In *Airlie Foundation, Inc. v. Evening Star Newspaper Co.,* 337 F.Supp. 421 (D.D.C.1972), the court considered a several-publication libel suit. The court noted the possibility that "the publisher's initial evaluation of his story and his decision to publish will be undercut by subsequent developments." The court in *Airlie* recognized that, under Supreme Court holdings, later events "may have no probative value as they relate to earlier publications", citing *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 55, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); and that information revealed after the first publication, insofar as it bears on the publisher's investigative efforts, need not necessarily be taken as evidence of malice, citing the *Times* decision at 376 U.S. 287, 84 S.Ct. 710. But the court went on to observe, in a discussion which illuminates the considerations pertinent to the present case:

"But while it is well established that a failure to investigate, without more, is insufficient to give rise to liability, once one has undertaken to conduct an investigation he should not be permitted to ignore with impunity the fruits of that investigation . . .

"Here the defendant attempted to obtain confirmation or denial of the charges from the Director of the CIA after initial publication. The Star's editor testified that he received an emphatic denial, one which, in his own words, left him 'considerably shaken.' Nevertheless, the Star again published an account of the Higgs press conference the following day. While the headline featured Dr. Head's denial, the text included several details not raised by Higgs, including, among others, the CIA refused to comment. Faced with this testimony and evidence there was a basis established with convincing clarity upon which the jury might well have concluded these details were known by the Star to be false and were added by it to lend credence to the Higgs charges at a time when it entertained serious doubts as to the validity of those charges. Accordingly, the Court concludes that the evidence was sufficient to go to the jury on the question of whether the Star published 'with knowledge that it was false or with reckless disregard of whether it was false or not' as required by the New York Times case." 337 F.Supp. at pp. 427–8.

Again, I of course express no view as to whether Herbert will succeed in developing any useful evidence as the result of post-publication inquiry. I hold only that he is entitled to such inquiry under the discovery rules.

## VIII.

The next disputed item involves a CBS memorandum prepared by one of its "house" attorneys under the following circumstances.

During his deposition, Lando testified that sometime after the broadcast Col. Franklin telephoned him. Franklin told Lando he was contemplating an action against Herbert, and asked if his (Franklin's) attorney could talk to Lando. Lando replied that he did not know; he would "have to check with CBS to see" (722). Lando testified:

"The information that I conveyed to CBS was that Franklin's attorney had contacted me—by that time Franklin had contacted me, told me he was bringing suit over the book, and wanted to know if I would speak to his attorney to give him information. I believe that is what I relayed to CBS." (725).

Lando's inquiry produced the document under consideration. It is a memorandum dated July 17, 1973, written by Michael J. Goldey, an attorney on the staff of the CBS Law Department. The memorandum was addressed to (1) David Klinger, Vice President and Assistant to the President of CBS News, and in charge of liaison between the Law and News Departments; (2) Don Hewitt, the executive producer of the 60 MINUTES program; and (3) Joseph M. Walsh, the General Attorney, Publishing, with initial responsibility for rendering legal advice on matters relating to CBS's publishing operations. Copies of the memorandum were sent to John D. Appel (Deputy General Counsel), Ralph E. Goldberg (General Attorney for Governmental Affairs), and Lando.

The thrust of the memorandum, Lando testified, was "that my position would be that there would be no contact, no information given to Franklin or his attorney for this suit" (724). Accordingly Lando advised Franklin's attorney that "I could not give them any information whatsoever" (722).

CBS, Lando and Wallace invoke the attorney-client privilege in respect of this memorandum. Herbert contends that, in the circumstances of the case, the privilege either does not apply or has been waived.

 I start with the observation that the memorandum in question is a communication from an attorney to a client,[1] and not from a client to an attorney. The distinction is significant, because of the rationale underlying extension of the privilege to the attorney's communications. "The reason for it", says Wigmore,[2] "is not any design of securing the attorney's freedom of expression, but the necessity of preventing the use of his statements as admissions of the client, or as leading to inferences of the tenor of the client's communications . ."

In *United States v. Silverman*, 430 F.2d 106 (2d Cir. 1970), *cert. den.*, 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971), the Second Circuit held that no privilege attached to minutes delivered by a client to its attorney, because the minutes were a matter of public record. The court applied and interpreted Wigmore's analysis:

"The privilege as commonly formulated refers to a confidential communication from the client to the attorney. 8 Wigmore, Evidence § 2292 (McNaughton rev. ed. 1961); compare Uniform Rule of Evidence 26 ('between lawyer and his client'). Wigmore states that the reason for bringing communications from the attorney to the client within the privilege is to prevent adopted admissions or inferences of the tenor of the client's communication. 8 Wigmore, Evidence § 2320 (McNaughton rev. ed. 1961). The purpose of the privilege, the encouragement of full disclosure to the attorney in procuring legal advice, implies that a communication from an attorney is not privileged *unless it has the effect of revealing a confidential communication from the client to the attorney.*" 430 F.2d at 122 (emphasis added).

Judge Moore's opinion quotes with approval this discussion from *United States v. United*

---

1. The attorney-client relationship extends to "house" counsel and members of the corporate control group. *Burlington Industries v. Exxon Corp.*, 65 F.R.D. 26 (D.Md.1974).

2. 8 *Wigmore on Evidence* (McNaughton rev., 1961), § 2320, p. 629.

*Shoe Machinery Corp.*, 89 F.Supp. 357, 359 (D.Mass.1950):

" 'It follows that in so far as these letters to or from independent lawyers were prepared to solicit or give an opinion on law or legal services, such parts of them are privileged *as contain, or have opinions based on, information furnished by an officer or employee of the defendant in confidence and without the presence of third persons.* * * *

" 'However, * * * there is no privilege for so much of a lawyer's *letter, report or opinion as relates to a fact gleaned from * * * a public document* such as a patent, cf. *Edison Electric Co. v. United States Electric L[ighting] Co.,* [44 F. 294 (C.C.S.D.N.Y.1890)].' " (emphasis added).

Another statement of the underlying rationale appears in *Georgia-Pacific Plywood v. United States Plywood Corp.,* 18 F.R.D. 463, 464 (S.D.N.Y.1956):

"Since communications by the attorney to the client *might reveal the substance of a client's communication* they are also within the privilege." (emphasis added).

In *United States v. International Business Machines Corp.,* 66 F.R.D. 206 (S.D.N.Y.1974), Chief Judge Edelstein reviewed these authorities and concluded:

"In light of the clear guidance from the Second Circuit on this matter and because the approach recommended by the Masters coincides with the purpose of the attorney-client privilege, this court is constrained to reject defendant's formulation of the attorney-client privilege as it applies to communications from lawyers to their clients. This court will abide by the view that such communications are privileged *only to the extent that they reveal confidential information communicated by the client to the lawyer.* Accordingly, the proper focus of the Masters' inquiry must be whether or not the document as to which privilege is claimed can be said *to reveal such a communication.*" 66 F.R.D. at 212 (emphasis added).

Applying these principles to the case at bar, it is apparent that certain difficulties arise with respect to defendants' claim of privilege. The memorandum in question does not automatically achieve privileged status because its author was an attorney. Nor is privileged status automatically conferred by the fact that the memorandum may express an opinion of counsel; opinions are privileged only to the extent that they are based upon, and consequently reveal, information furnished by the client in confidence.

In the case at bar, it is somewhat difficult to see how Lando's inquiry, prompted by the telephone call from Col. Franklin, can be viewed as "confidential information communicated by the client to the lawyer", *United States v. International Business Machines Corp., supra.* It is not even certain that Lando directed his inquiry to one of the CBS legal staff; he speaks only in terms of conveying the information of Franklin's request "to CBS". But we may assume that Lando directed his inquiry to a member of the legal staff; in any event, the question ultimately found its way there, and was apparently dealt with by Mr. Goldey. But the question remains: How can it be said that disclosure of the memorandum would have "the effect of revealing a confidential communication from the client to the attorney", in the words of *United States v. Silverman, supra?* Lando's communication has already been revealed in his deposition testimony: "Franklin is thinking of suing Herbert, and wants me to talk to his attorney—shall I do it?" Revelation of that inquiry having already been accomplished, there is no basis for contending that the responsive memorandum is privileged because it might tend to reveal the inquiry.

It may be, however, that the contents of the memorandum contain information, comments, or opinions which are based upon or reveal confidential communications addressed to counsel by other CBS officers or employees. The Court cannot determine this question without examining the document. Accordingly, counsel for the defendants are directed to furnish the Court with a copy for inspection *in camera.* There is

ample authority for proceeding in that manner. See *In Re Grand Jury Subpoena Duces Tecum*, 391 F.Supp. 1029, 1033 (S.D. N.Y.1975).

▮ Herbert also argues that the memorandum is beyond the scope of the attorney-client privilege because (a) it deals with business advice, rather than legal advice; and (b) Lando is not within the "control group" of CBS employees, so that, at the very least, the forwarding of a copy of the memorandum to him waived the privilege. I reject these arguments. Lando's inquiry was clearly intended to evoke legal, not business or professional, advice. Franklin contemplated litigation against Herbert; Lando was asked to confer with Franklin's attorney; the Legal Department of CBS took the question under advisement. Potential lawsuits and actual attorneys were in the air; this is the atmosphere within which counsel live, move, and have their being. It is unreasonable to characterize the incident as one involving business or professional advice. As for the "control group" contention, giving full force to that line of authority and assuming without deciding that Lando falls outside the group, the individuals to whom the memorandum was addressed clearly fall within the group, and I decline to hold that the receipt by Lando of a copy constitutes a waiver binding upon all defendants, individual and corporate.

## IX.

The discovery disputes between Herbert and the defendant Atlantic concern the following two items:

(1) Herbert's request for discovery of Atlantic's communications with its counsel on the subject of the Lando article printed in Atlantic in May, 1973, such communications having taken place prior to publication; and

(2) Herbert's request for discovery of Atlantic's internal communications and communications with Lando, subsequent to the receipt by Atlantic of a "bill of discrepancies" prepared by Herbert's literary agent, one Gerard McCauley, and sent to Atlantic more than four months after publication.

These disputes are considered in order.

▮ While the subject of pre-publication communications between Atlantic and its attorney, Conrad Oberdorfer, Esq., of the firm of Choate, Hall & Stewart in Boston, has generated considerable discussion in the briefs, it would appear that we are concerned with only one communication. It appears from the affidavit of Robert Manning, the Editor-in-Chief of Atlantic, that on March 9, 1973 he received a letter from Mr. Oberdorfer. Mr. Oberdorfer wrote to Manning, presumably in response to the latter's prior request, in order to give his advice on the proposed Lando article, and to recommend that Manning raise certain questions about the article with Lando. Manning sent Oberdorfer's letter on to Lando for his comments. The forwarding by Atlantic of counsel's letter to Lando, of course, waived any attorney-client privilege that might otherwise have obtained; and Atlantic has quite properly produced the March 9 Oberdorfer letter to Manning, and Atlantic's forwarding letter of March 13 to Lando, for inspection by Herbert. Manning's affidavit recites that, apart from these two letters, "Atlantic had only one communication with its attorney during the pre-publication period. This was a brief letter from Atlantic to Mr. Oberdorfer during the period before Oberdorfer's March 9, 1973 letter." The Court has no basis to doubt Mr. Manning's sworn statement, and plaintiff suggests none. Accordingly this area of dispute appears to be limited to that one "brief letter" from Atlantic to its counsel, written before the March 9, 1973 letter from counsel to Atlantic which has already been produced.

There is substantial authority for the proposition that voluntary disclosure of privileged matter to a third party waives the privilege, at least with respect to the particular subject matter involved in the disclosure.

In *In Re Penn Central Commercial Paper Litigation*, 61 F.R.D. 453, 464 (S.D.N.Y.

1973), this court said in an opinion by Chief Judge Edelstein:

> "The theoretical predicate underlying all recognized privileges is that secrecy and confidentiality are necessary to promote the relationship fostered by the privilege. Once the secrecy or confidentiality is destroyed by a voluntary disclosure to a third party, the rationale for granting the privilege in the first instance no longer applies."

The court added that "a claim of privilege cannot be selectively waived", citing, among other cases, *Lee National Corp. v. Deramus*, 313 F.Supp. 224 (D.Del.1970), in which the court held that a party's free and voluntary revelation of otherwise privileged communications with its counsel on a particular subject matter (by-law and charter amendments) constituted a waiver of the attorney-client privilege with respect to that particular subject matter. The court observed:

> "Fairness demands that all occasions when this subject matter was discussed with counsel be revealed." 313 F.Supp. at p. 227.

In the case at bar, Atlantic requested counsel's advice in respect of the intended Lando article. Counsel's response, in the form of the March 9, 1973 letter, was then voluntarily disclosed by Atlantic to a third party, namely, Lando. Assuming *arguendo* that the March 9 letter was originally privileged, the privilege was lost by disclosure to Lando. It follows that any pre-publication communications between Atlantic and its counsel on that particular subject matter are no longer protected by the privilege. If the pre-March 9 "brief letter" from Atlantic to counsel deals with the same subject matter as the March 9 letter, then the prior letter must be revealed.[3] In order that a proper determination may be made, I direct that the Court be furnished with a copy of the letter in question for examination *in camera*.

The post-publication discovery disputes involving Atlantic turn upon quite different facts. Printed copies of the May, 1973 issue of the Atlantic magazine became available in mid-April. It appears from the affidavit of C. Michael Curtis, an associate editor of Atlantic, that copies of the issue were sent, as soon as they became available, on April 17, 1973 to Herbert, his literary agent McCauley, and certain other individuals. Atlantic took this action because of a prior request it received from McCauley, in the latter part of March, 1973, McCauley having evidently learned of the intended Lando article, and having asked if Atlantic could print a reply by Herbert in the same issue. Curtis had advised McCauley that such an arrangement could not be made.

Ultimately, McCauley forwarded to Curtis, as an enclosure to a letter dated August 16, 1973, a typed list of 27 "discrepancies" in connection with the Lando article which appeared in Atlantic. These "discrepancies" consist, in sum, of Herbert's points of disagreement with factual assertions in the Lando article. This document was accompanied by 44 pages of documentation intended to support Herbert's position. McCauley's forwarding letter to Curtis describes the enclosure as "a list of 27 items which seem to contradict Barry Lando's article"; the letter concludes:

> " . . . I look forward to receiving some response from *The Atlantic*."

The Curtis affidavit says:

> "Upon receipt of the 'bill of discrepancies', I sent copies both to defendant Barry Lando, the author of the article, and to Atlantic's counsel, and discussed it with other editors at the Atlantic. This was followed by communications back and forth, primarily in writing, concerning Herbert's charges as itemized by McCauley and the way in which those charges might be met. It is such communications, undertaken when we knew that litigation was likely, and with a view to deciding how we should answer plaintiff's charges, that plaintiff now seeks to discover."

As appears from the Curtis affidavit, Atlantic takes the position that the Herbert list of discrepancies was compiled by Her-

---

**3.** See also *Garfinkle v. Arcata National Corp.*, 64 F.R.D. 688, 689 (S.D.N.Y.1974).

bert in anticipation of suing Atlantic, so that Atlantic's subsequent communications, prompted by the Herbert list, are vested, in addition to customary attorney-client privilege, with the protection afforded by Rule 26(b)(3), F.R.C.P.

Herbert denies that his list of discrepancies was prepared at a time when he was contemplating litigation against Atlantic. He ascribes to other reasons the fact that he did not reply to the Atlantic article until four months after Atlantic had sent him a copy (Atlantic relies upon this delay as evidence of Herbert's intention to litigate, rather than to obtain a correction from Atlantic).

■■■ I conclude, without undue difficulty, that the communications referred to were made "in anticipation of litigation", as that phrase is used in Rule 26(b)(3). Of course, it is not decisive on the issue that Col. Herbert had not yet commenced suit against Atlantic. In the landmark case of *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court stated that the work-product privilege extends to those documents prepared "with an eye toward litigation". This court has said, in *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.*, 47 F.R.D. 334, 337 (1969):

> "If the prospect of litigation is identifiable because of specific claims that have already arisen, the fact that, at the time the document is prepared, litigation is still a contingency has not been held to render the privilege inapplicable."

Herbert's list of discrepancies, while not referring specifically to an intent to litigate, may certainly be regarded as "specific claims" that he caused to arise in respect of the Lando article. Professor Wright reminds us:

> "Prudent parties anticipate litigation, and begin preparation prior to the time suit is

formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." 8 Wright and Miller, *Federal Practice and Procedure* (1970) at § 2024, p. 198.

Herbert's communication to Atlantic clearly gave rise to the "prospect of litigation", and it would have been imprudent for Atlantic to conclude otherwise. Communications may be characterized as having been carried on "with an eye toward litigation", even though they were prompted by a desire to avoid, and not prepare for, a possible suit. *Vilastor-Kent Theatre Corp. v. Brandt*, 19 F.R.D. 522 (S.D.N.Y.1956). While a showing of a "remote possibility of litigation" is not sufficient to invoke Rule 26(b)(3), *Garfinkle v. Arcata National Corp.*, 64 F.R.D. 688, 690 (S.D.N.Y.1974), I conclude that the present case cannot be so characterized. This is so, even accepting Herbert's statement that "in going over the errors in Lando's article with McCauley", he did not contemplate a lawsuit at that time. The seeds of prospective litigation had been sown; they ultimately came to fruition; and I cannot agree with plaintiff that, once Herbert's communication had been received by Atlantic, the prospects of the litigation which eventually came to pass were so remote that the Rule does not apply.

However, that is not an end of the inquiry. Rule 26(b)(3) permits discovery of "documents and tangible things" covered by the Rule, upon a showing by the party seeking the discovery that he "has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means."[4] The only mandatory protection

---

4. Rule 26(b)(3) provides in full:
 "Trial Preparation: Materials. Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial

afforded by the Rule appears in its last sentence, which directs the trial court to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

I hold that, in the circumstances of this case, Herbert has made the requisite showings of need and hardship. While Atlantic argues that post-publication communications cannot possibly be relevant, I have reached a contrary conclusion with regard to the other defendants' comparable argument (see Point VII, *supra*), and reach the same conclusion here. In this regard, I cannot wholly accept Atlantic's characterization of itself as nothing but a "conduit" through which Lando was expressing his views. The article, Exhibit B to the complaint, is entitled: "The Herbert Affair, by Barry Lando". The article is prefaced, however, by the following paragraph, presumably the "work product" of an Atlantic editor, and not Lando:

"He seemed to be the perfect soldier, a hero in Korea and in Vietnam. Then he was driven out of the Army, his career ruined because he tried to prevent his superiors from concealing war crimes against the Vietnamese. That was the story a television producer persuaded his superiors at CBS should be presented to a nationwide audience. As the producer and his associates began assembling the facts, they found it changing into a very different story, one that left the reporter disillusioned and the hero threatened with decanonization. The producer here tells how the case unfolded for him, from his first, convincing interviews with Lieutenant Colonel Anthony Herbert, through intensive researching of Herbert's alarming charges against fellow Army officers, to a dramatic confrontation between Herbert and some of those who disputed him on the CBS program, Sixty Minutes, shown on February 4 of this year. It is a

tangled story, to say the least. One of its lesser anomalies: Herbert's book Soldier, now profitably riding the best-seller list, is published by Holt, Rinehart and Winston, which is owned by CBS, the organization that has done the most to attack the book's integrity."

While perhaps stopping short of placing its own *imprimatur* upon the truth of Lando's assertions, Atlantic's references to "intensive researching" by Lando which "left the reporter disillusioned and the hero threatened with decanonization" may have served to give that impression. In any event, it is apparent that post-publication communications, involving Atlantic and other members of its corporate family, or Atlantic and Lando, may lead to the discovery of admissible evidence on the issue of pre-publication state of mind, on the part of both Lando and the Atlantic editors.

In consequence, the Court's ruling on this aspect of the case is that counsel for Atlantic are to submit to the Court all pertinent documents for *in camera* inspection, so that the protection mandated by the last sentence of the Rule can be assured. In respect of any continued or future oral depositions, counsel for plaintiff are directed not to inquire in respect of "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative" of Atlantic "concerning the litigation"; and Atlantic's witnesses are not obliged to answer such questions if asked.

## X.

The final area of dispute relates to Herbert's demand for production of:

". . . documents in the possession of CBS news, Wallace or Lando during the period June 1, 1971 to February 4, 1973 (to May, 1973 in regard to Lando) regarding Col. Herbert, the 173rd Airborne Brigade while in Vietnam, individuals appearing or referred to on the 60 MIN-

need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the re-

quired showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

UTES segment and events described in *Soldier . . .* which were not specifically known to Wallace and Lando at the time the program was being produced."

Herbert's counsel contends that such documents, even if not specifically known to Wallace or Lando at the time of production of the telecast, nevertheless may lead to the discovery of admissible evidence relating to whether the defendants "published the charged libel in reckless disregard of its truth or falsity." (affidavit of counsel, para. 3).

The defendants contend that documents in the files of the corporate or individual defendants, of which the individual defendants were not aware at the time of publication, cannot possibly be relevant in respect of their state of mind at the time of publication. Particular reliance is placed upon *New York Times v. Sullivan, supra,* in which it was said:

"Finally, there is evidence that the Times published the advertisement without checking its accuracy against the news stories in the Times' own files. The mere presence of the stories in the files does not, of course, establish that the Times 'knew' the advertisement was false, since the state of mind required for actual malice would have to be brought home to the persons in the Times' organization having responsibility for the publication of the advertisement. With respect to the failure of those persons to make the check, the record shows that they relied upon their knowledge of the good reputation of many of those whose names were listed as sponsors of the advertisement, and upon the letter from A. Philip Randolph, known to them as a responsible individual, certifying that the use of the names was authorized. There was testimony that the persons handling the advertisement saw nothing in it that would render it unacceptable under the Times' policy of rejecting advertisements containing 'attacks of a personal character'; their failure to reject it on this ground was not unreasonable. We think the evidence against the Times supports at most a finding of negligence in failing to discover the misstatements, and is constitutionally insufficient to show the recklessness that is required for a finding of actual malice." 376 U.S. at pp. 287–8, 84 S.Ct. at 730.

While this Court fully recognizes the impact of the *Times* decision, the particular language of the opinion must be considered within the context of the facts of the case. The alleged libel in *Times* consisted of a full-page advertisement that the newspaper carried, which included statements, some of them false, about police action allegedly directed against students who participated in a civil rights demonstration. The newspaper published the advertisement upon an order from a New York advertising agency acting for the signatory committee; the agency submitted the advertisement with a letter from A. Philip Randolph, chairman of the committee, and well known to the Times advertising acceptability department as a responsible person. Mr. Randolph certified that the persons whose names appeared on the advertisement had given their permission.

In the case at bar, the Herbert story did not come to CBS, Lando or Wallace unsolicited and through the mail. On the contrary, it was at Lando's initiative that the Herbert story came into being; he did the investigations; and CBS and Wallace, together with Lando, worked together in assembling and putting on the air the program which resulted from Lando's efforts. This situation, in my judgment, is quite different from the fact situation presented in *Times*, which turned upon the question of whether members of the advertising department should have checked the files of the news department in respect of statements in an advertisement which had come, unsolicited and entirely without their own inquiry into the facts, to the attention of the advertising department.

In *Goldwater v. Ginzburg, supra,* the Second Circuit considered the contention of the defendants that the trial court erred in permitting the head of a public opinion survey organization to testify that the de-

fendants did not use a valid method of conducting the poll of psychiatrists to which they referred in their unflattering article about Senator Goldwater. That evidence, the defendants argued, was irrelevant "for at most it would only tend to show that appellants were negligent pollsters." 414 F.2d at 343. The Second Circuit disagreed, observing that the *Times* case "does not hold that evidence of negligence is inadmissible; it only holds that evidence which merely establishes negligence in failing to discover misstatements, *without more*, is constitutionally insufficient to support the finding of recklessness required to establish actual malice from proof of less than prudent conduct." 414 F.2d at 343 (emphasis added).

As previously noted, *Goldwater v. Ginzburg* teaches that evidence of reckless disregard for truth must be viewed in its totality. Thus, as one of the elements in that case "tending to prove actual malice", the Second Circuit observed that "the seriousness of the charges called for a thorough investigation but the evidence reveals only the careless utilization of slipshod and sketchy investigative techniques." 414 F.2d at 339.

 If, as *Goldwater v. Ginzburg* indicates, the utilization of "slipshod and sketchy investigative techniques" can be considered as evidence of actual malice, then the question arises: Could the material sought by discovery lead to the develop-

ment of such evidence? The concept is stated in terms of possibility, since that is the context within which requests for discovery must necessarily be viewed. The Court concludes that the question must be answered in the affirmative. Assume, for the sake of the discussion, that the CBS telecast contained false statements concerning Herbert, the falsity of which would have been demonstrated by documents then in possession of CBS, Lando or Wallace. The *Times* decision does not brand as inadmissible the failure of an investigatory reporter to consult the files of his own newspaper (or television news facility) before publishing a false and defamatory statement which examination of those files would have prevented.[5] Again, I do not say that such facts actually exist in the case at bar; but Herbert is entitled to inquire.

However, the scope of inquiry indicated by the affidavit of counsel for plaintiff, at para. 3, is unduly broad, and compliance would be too burdensome to the defendants to justify full compliance. Production is demanded of documents "regarding Col. Herbert, the 173rd Airborne Brigade while in Vietnam, individuals appearing or referred to on the 60 MINUTES segment, and events described in *Soldier*." Quite obviously, there could be many references in the files to the Brigade's service in Vietnam which would have nothing to do with this litigation. That is equally true of events described in Col. Herbert's book. Plaintiff

5. One may hypothesize a situation from another chapter of military history. Assume that, following Custer's defeat at the Little Bighorn, an investigative reporter for a leading newspaper researched the causes of the defeat, and wrote an article which his newspaper printed, which advanced the proposition that Major Reno withdrew, not as the result of Indian action, but because of the ill-advised order of one General X who was in the area and inserted himself into the chain of command. Assume further that, at the time of publication, the newspapers's files contained stories demonstrating that, when the battle occurred, General X was in Europe on a military mission. I cannot accept that, in General X's subsequent suit for defamation against the reporter and the newspaper, such a disregard of readily available information would not be admissible as one possible indication, to be considered by the

trier of the fact together with any other indicia, on the question of reckless disregard for the truth. (I am further assuming for this discussion that General X was a "public figure", and that the *Times* case and its progeny had been decided by the Supreme Court at the time of Custer's last stand.) The distinction lies, as the Second Circuit points out in *Goldwater v. Ginzburg, supra,* between the insufficiency of negligent investigation standing alone, and its admissibility into evidence as one factor among several, on the issue of reckless disregard. The present defendants argue, in essence, that because negligent investigation without more is not sufficient in law to establish reckless disregard, it cannot be considered, together with other elements, as part of the overall proof. That is a *non-sequitur*, and the missing link in the chain of logic is supplied neither by *Times* and its progeny nor the First Amendment.

is entitled to discovery of such documents as might exist in the files, and which relate specifically to the contents of the telecast and the article in Atlantic.

For the guidance of counsel in implementing this opinion, I direct that documents in the following categories, existing in the indicated files at the indicated times, be produced:

1. Any documents prepared by, pertaining to or mentioning Herbert; John Barnes; Ross Franklin; John Douglas; a Col. Rector; Kenneth Rosenblum; Richard Heintz; Bruce Potter; Robert Stemmies; Michael Plantz; William Hill; James Grimshaw; John Bettorie.

2. Any documents pertaining to or mentioning the February 14, 1969 "St. Valentine's Day Massacre" in Viet Nam.

3. Any documents pertaining to or mentioning the presence or absence of Col. Franklin in Viet Nam on February 14, 1969, including references to individuals interviewed on that subject.

4. Any documents referring to the service of the 173rd Airborne Brigade in Viet Nam during Herbert's tour of duty there.

These categories are not intended to be all-inclusive. They are intended, however, to demonstrate that the defendants are not obligated to produce reams of material which have no direct bearing upon the issues posed by the allegedly libelous publications.

## XI.

Herbert also contends that Lando, during his deposition, failed to respond fully to questions which were not made the subject of objections. Since the hearing on this case, counsel for Herbert have withdrawn a number of demands that further answers be furnished. I have examined the remaining questions, and agree with plaintiff's counsel that the answers previously given do not entirely track with the questions. Presumably, as the result of this opinion, Mr. Lando will be deposed further. Plaintiff's counsel may, if they wish, again put the questions under consideration to Mr.

Lando, and further answers will be required.

## XII.

The foregoing constitutes the Court's order in this matter. I perceive no present need for the settlement of a further order. Counsel for the parties should be able to proceed in the case, in a manner consistent with this opinion and order. However, should the necessity for further applications arise, they may be addressed to the Court.

With respect to the documents that are to be furnished to the Court for inspection *in camera*, further rulings will be announced as soon as that process had been accomplished.

It is So Ordered.