## UNITED STATES v. MATOT.

### No. 55.

Circuit Court of Appeals, Second Circuit.

Dec. 18, 1944.

Philip M. M. Phelps, of Fair Haven, Vt., for appellant.

Joseph A. McNamara, U. S. Atty., and Bernard J. Leddy, Asst. U. S. Atty., both of Burlington, Vt., for appellee.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

Matot appeals from a judgment of conviction under an indictment, charging him as an abettor of one, Holmes, the cashier of a national bank, in the wilful misapplication of the bank's moneys, in violation of § 592 of Title 12, U.S.C.A. The appeal turns substantially altogether upon the exclusion of an offer of testimony by Matot,

who took the stand in his own defense. To an understanding of the significance and importance of the ruling, some statement of the facts is necessary. Holmes was in the habit of allowing his friends to draw cheques upon their deposit accounts, when he and they knew them to be insufficient. When the cheques were presented through the clearing house, or were cashed over the counter, Holmes placed them in a drawer in his office, and apparently covered the charges by false entries upon the books. He favored eighty depositors of the bank in this way—Matot among them, 123 of whose cheques he had honored between October 1942 and February, 1943. All these Matot had drawn when his deposit was not large enough to meet them—the total overdraft being over $4,000. He had been a director of the bank between 1915 and 1929, his secretary had often told him that his account was overdrawn, and he himself acknowledged that he knew it was. He also owed the bank $6,000 upon notes, the limit of his credit. Nevertheless, he was a man of substance in the Town of Poultney, where the bank was, engaged in a business of quarrying slate, which he had inherited from his father. There was no reason to suppose that he could not have amply responded to all his indebtedness to the bank.

After Holmes's defalcations were discovered in February of 1943, the bank's directors called Matot before them and asked him to make good the overdrafts. He said that he would make arrangements to do so and also to pay his notes. His testimony to this interview the judge admitted; but he excluded an interview, three or four days later, between Matot and the bank's president, his testimony as to which would have disclosed that he suggested to the president the immediate sale of some of his real estate, and that the president urged him not to sell it at a sacrifice.

 We read the words, "with intent in any case to injure or defraud such Federal reserve bank," as limiting all of § 592 that goes before: that is, as not confined to the making of false entries. Perhaps that construction is unnecessary, for "wilful misapplication" of money presupposes a fraudulent intent, as does "embezzlement"; and, although "abstraction," standing alone, might perhaps be read otherwise, the context forbids. Indeed, the prosecution itself concedes that it was obliged to prove fraudulent intent. The sit-uation was curious. Matot was a man, engaged in a business, apparently prosperous; he had ample means to meet his indebtedness to the bank; and he must have known that at some time and in some way he would be called to meet his overdrafts. It is hard to believe that he could have really intended to defraud the bank, particularly because, if he did, he was bound to fail. Indeed, Holmes's own defalcations were also curious; it remains totally inexplicable why he should have accommodated his friends without any ascertainable profit to himself and at great risk. For these reasons any evidence of Matot's good faith was highly important. True, the judge allowed him to testify to his interview with the Board of Directors, where he said that he "would make arrangements to have everything cleaned up"; but we cannot see what difference there was between that and the later interview with the president, at which he volunteered to sacrifice his real property. It is of course possible that the offer indicated only a change of heart, an effort to avoid the consequences of what he had done; but it was also possible to take another view and read it as confirmation of his denial that he had ever contemplated a fraud, and that he was ready to go to lengths to protect the bank. That possibility appears to us enough, especially in so close a case, to entitle him to lay the interview before the jury to interpret as they would.

The prosecution seeks to defend the exclusion on the theory that the testimony would have been "self-serving," and that it was not part of the "res gestae." What else but "self-serving" the testimony of an accused person on his direct examination is likely to be, we find it difficult to understand; and as for "res gestae," it is a phrase which has been accountable for so much confusion that it had best be denied any place whatever in legal terminology; if it means anything but an unwillingness to think at all, what it covers cannot be put in less intelligible terms. Although Matot's testimony was the only direct evidence upon his intent, it was not fair to confine him to a bare denial—never impressive in the mouth of the accused. He was entitled to corroborate that denial by any conduct which confirmed it. Had he called the president, the question would have been the same; yet it is hard to believe that anyone would maintain that there was so little probative connection between

the offer and his original purpose, that no jury could infer the second from the first. The exclusion of evidence, which does not too much entangle the issues and confuse the jury, merely because of its logical remoteness from the issue, is always a hazard, and is usually undesirable. It is always hard to say what reasonable people may deem logically material, and all doubts should be resolved in favor of admission, unless some definite rule, like that against hearsay, makes that impossible. While in a clearer case we might disregard the error, it seems to us, so doubtful are we of the accused's guilt, that Matot should have been allowed whatever advantage the testimony might have given him.

On the other hand, what his secretary said to the bank's president was only hearsay, and clearly had to be excluded.

Conviction reversed; new trial ordered.