948 A.2d 636

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. TYKIM KEMP, DEFENDANT–APPELLANT.

Argued November 13, 2007—Decided June 16, 2008.

*Lon C. Taylor,* Assistant Deputy Public Defender, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Joie D. Piderit,* Deputy Attorney General, argued the cause for respondent (*Anne Milgram,* Attorney General of New Jersey, attorney).

Justice RIVERA–SOTO delivered the opinion of the Court.

Defendant Tykim Kemp challenges his felony murder, robbery and conspiracy convictions, claiming that the trial court made three erroneous evidentiary determinations.

We conclude that, while the details of defendant's confession to having engaged in a two-day robbery spree properly were admissible against him at his trial as evidence of "motive, opportunity, intent, preparation, [and] plan[,]" as provided in *Evidence Rule* 404(b), the admission of evidence concerning a prior uncharged robbery purportedly also involving defendant was error requiring a retrial. We further conclude that, although the admission of hearsay statements in respect of the manner and reasons the police focused on defendant as a suspect may have been error, any error was harmless. Finally, we also conclude that, under the circumstances presented, it was not reversible error to admit a police officer's testimony concerning defendant's truthfulness in his confession.

I.

Starting on Sunday, September 30, 2001, defendant and an accomplice identified only as "B" or "Black"[1] engaged in a two-day robbery spree that ultimately resulted in the death of their last victim, Manuel Santiago. According to defendant's typewritten confession, he was with Black "all of Sunday and Monday morning[,]" during which time they "robbed a couple of people ... in the area of Brunswick Street, Parkhurst and Pennsylvania Ave" in the City of Newark.

---

[1] Other witnesses referred to defendant's accomplice as "OG."

Focusing on the period starting at approximately 6:30 a.m. on Monday, October 1, 2001, defendant explained that he and Black had been "roaming around trying to find someone to rob." They approached Santiago, who was sitting in a parked minivan at the entrance to 37 Brunswick Street. Defendant claimed that Black threw a beer bottle at the minivan "to make [Santiago] get out of the van ... so [defendant and Black] could rob him and get his money."[2] As Santiago exited the minivan, Black "tried to grab him but [Santiago] got out of the van swinging [a] knife." Defendant fought with Santiago, suffering cuts to his "right middle finger and [his] left leg under the knee cap[,]" while Black "tried to go into [Santiago's] pockets." According to defendant, he did not rob Santiago "because he put up a fight, he cut me and I wasn't feeling it." Asserting that it was Black who had stabbed Santiago "because he had the knife"—albeit a knife defendant had taken from "a dude that I robbed Sunday night" and had given to Black for his use "after we came out of the building early Monday morning"—defendant described that Santiago "fell to the ground by the building[,] then I ran." Santiago died later that day from his knife wounds.

That same day, Detective Richard Gregory of the Homicide Squad of the Essex County Prosecutor's Office "receive[d] information that made [him] look at [defendant] as a possible suspect[.]" In conjunction with detectives from the Newark Police Department, Det. Gregory investigated Santiago's murder. That investigation led to defendant's girlfriend, Laini Tallmadge, who was asked to come to the police station and provide a statement. The following day, October 2, 2001, Tallmadge—and, surprisingly, accompanied by defendant—arrived at the police station to give her statement to Det. Gregory. They were placed in separate interview rooms. Defendant was advised of his *Miranda*[3] rights,

---

[2] Pieces of a shattered beer bottle were recovered from the area of the minivan's driver's side and were introduced as evidence at trial.

[3] *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

which he waived. He first claimed that he had been the victim of a robbery the prior day at a bus stop in Hillside, and that his wounds were the result of that robbery. However, once Det. Gregory expressed his belief that defendant was not being truthful, defendant confessed to participating in the assault and robbery of Santiago a day earlier. He claimed, though, that he had not stabbed Santiago, but that Santiago had been stabbed by Black. He also claimed that he had been unaware that Santiago had died as a result of the stabbing until he was so informed by the police.

The Essex County Grand Jury returned a seven count indictment charging defendant with first-degree knowing and purposeful murder, in violation of *N.J.S.A.* 2C:11–3(a)(1) and (2); first-degree felony murder, in violation of *N.J.S.A.* 2C:11–3(a)(3);[4] first-degree robbery, in violation of *N.J.S.A.* 2C:15–1; fourth-degree unlawful possession of a weapon (a knife), in violation of *N.J.S.A.* 2C:39–5(d); third-degree possession of a weapon (a knife) for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4(d); and second-degree conspiracy to commit robbery, in violation of *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:15–1.

In June 2003, defendant was tried before a jury on that indictment. The jury acquitted defendant of the murder and weapons offenses, but deadlocked on the robbery, felony murder and conspiracy charges. In December 2003, defendant was retried on the remaining charges. It is that retrial that gives rise to this appeal.

The State's first witness was Katherine McMiller,[5] who had been identified as one of the robbery victims in the same geographic area and time frame consistent with defendant's admission

---

[4] The indictment describes this statutory reference as *N.J.S.A.* 2C: *15–3(a)(3),* a provision that does not exist.

[5] The trial transcripts identify this witness as "Kaathrine McMiller." The parties, in their submissions, have referred to her as "Katherine McMiller" and we have adopted that spelling.

that he had robbed others the day before and in the same area as the Santiago robbery and murder. McMiller testified that, at approximately 9:00 p.m. on September 30, 2001, she was walking along Brunswick Street, near the intersection of Pennsylvania Avenue, when someone "came on [her] right side, put a sharp object to [her] neck, grabbed [her] hair, pulled [her] head back and told [her] to give them [her] pocketbook[,]" which she did. Although McMiller was able to describe who robbed her, she was not "able to identify any one positively who robbed [her]" and she was not "able to recognize the person who robbed [her]." She also explained that, when she was attacked, she screamed, and that her attacker ran after taking her pocketbook.[6]

Det. Gregory testified next. In addition to describing the crime scene he witnessed when he responded to the homicide call, he identified numerous photographs of the murder scene. Det. Gregory also explained that, based on the information developed in the investigation, the investigative focus came to rest on defendant and, for that reason, a request was made of Tallmadge, defendant's girlfriend, that she come to the police station and provide a statement. He further explained that when defendant's girlfriend arrived at the police station accompanied by defendant, they were separated and placed in different interview rooms. Det. Gregory then described the process by which defendant provided his

---

[6] Before defendant's retrial started, the trial court conducted an *Evidence Rule* 104 hearing to determine the admissibility of McMiller's testimony. At that hearing, the State set forth the following as foundational proofs. Bethsaida Flores, a resident of 37 Brunswick Street, testified that she was the granddaughter of the murder victim, that the night before her grandfather's murder she was in front of the building where she lived, she heard a woman scream, and then saw defendant run into her building and someone she identified as "OG" run by. Once she entered the building, she saw defendant in the hallway, where defendant "pulled out a knife and he was playing with the knife and he carved something in the wall, and he was singing some song." Flores's testimony was corroborated by Florinez Lopez, who was with Flores that evening and who was the girlfriend of the victim's son; Lopez, however, testified that OG also entered the building. Applying *Evidence Rule* 404(b) through the prism of *State v. Cofield*, 127 *N.J.* 328, 605 *A.2d* 230 (1992), the trial court admitted the evidence of the McMiller robbery as proof of motive or intent.

typewritten confession, a confession that was read, in part, to the jury.[7]

The victim's son, Wilson Santiago, testified that he saw defendant at his building—37 Brunswick Street—the night before his father was murdered and that defendant had a knife he was using to carve something into a hallway wall. He also testified that the following morning, in response to shouts from the street, he ran downstairs where he found his father stabbed and bleeding. He held his dying father in his arms until an ambulance arrived and his father was taken away. Bethsaida Flores and Florinez Lopez then testified consistent with their testimony at the *Evidence Rule* 104 hearing.[8]

Detective James Wright of the Homicide Unit of the Newark Police Department also testified. He explained how, on the day of Santiago's murder, he had asked Tallmadge to come down to the police station to provide a statement and that the next day, while he was out looking for defendant, he received a call that Tallmadge was at the station and that defendant was with her. Det. Wright then corroborated Det. Gregory's testimony concerning defendant's confession. The State also presented the testimony of Lieutenant Steven Bright of the Crime Scene Unit of the Essex County Prosecutor's Office, who was qualified as an expert and opined that no usable fingerprints were recovered from the crime scene, but that DNA evidence[9] had been recovered from the

---

[7] A determination of what portions of defendant's confession would be read to the jury also was the subject of a pretrial *Evidence Rule* 104 hearing. Defendant contended that four separate references to other crimes in his confession should be redacted as impermissible other crimes evidence under *Evidence Rule* 404(b); three other portions of the confession were redacted by consent. The trial court, citing to *Evidence Rules* 404(b) and 803(b)(1), and to *Cofield, supra,* rejected defendant's proposed additional redactions. Defendant's confession, as agreed between the parties, was read to the jury.

[8] *See* n.6, *supra.*

[9] As we explained in *State v. Harvey,* 151 *N.J.* 117, 156, 699 *A.2d* 596 (1997), *cert. denied,* 528 *U.S.* 1085, 120 *S.Ct.* 811, 145 *L.Ed.2d* 683 (2000), "[d]eoxyribo-

victim's knife; the parties stipulated that the blood on the knife recovered at the crime scene belonged to the victim, while defendant's blood appeared on a jacket taken from defendant and identified by witnesses as the jacket defendant was wearing the night before Santiago's murder.

Dr. Lyla Perez, an Assistant State Medical Examiner serving as the Regional Medical Examiner in Newark, was then qualified, without objection, as an expert in forensic pathology. She testified that she performed the autopsy on the victim. Based on the autopsy results, she opined that Santiago died of multiple stab wounds and that the manner of death was a homicide. Following Dr. Perez's testimony the State rested, and the trial court denied defendant's motion for judgment of acquittal pursuant to *Rule* 3:18–1.

Defendant testified on his own behalf. He disowned his confession, claiming that he had been tricked into signing it, and he further asserted he had not assaulted or robbed either McMiller or Santiago.

The jury returned guilty verdicts on all the remaining counts: first-degree felony murder, first-degree robbery, and second-degree conspiracy to commit robbery. Defendant was sentenced to a term of imprisonment of thirty years, with a thirty-year period of parole ineligibility, together with the appropriate penalties, fees and assessments.

Defendant appealed, raising the same issues that he has presented to us. In an unpublished decision, the Appellate Division determined that defendant's contentions lacked "sufficient merit to

nucleic acid (DNA) is a molecule of genetic materials shaped like a double-helix or spiral ladder. In every person, each cell with a nucleus contains a copy of that person's DNA. Thus, DNA serves as a blueprint for the human body." Further, "[n]o two individuals, except identical twins, have the same nucleotide sequences throughout their DNA. *Id.* at 157, 699 A.2d 596. Thus, DNA testing conducted on cells from various parts of the same body ... will yield the same results. As in this case, DNA analysis can help identify donors of genetic material, such as blood." *Ibid.*

warrant extended discussion in a written opinion" and affirmed defendant's convictions and sentence. The panel noted as follows:

> Defendant had given a statement to the police in which he admitted to other robberies with a companion on the night in question, preceding the attempted robbery of the victim in this matter and the scuffle that led to the victim's death. In his statement, defendant admitted to having had a knife in his possession earlier, but asserted that he had given it to his companion before the confrontation with the victim began. At trial, defendant denied the details of his statement, claiming they had been manufactured by the police and that he had signed the statement believing it to be a complaint that he had been attacked and injured while waiting for a bus.

> The trial judge rejected a challenge to the admissibility of the statement, ruling that it bore upon issues the jury could consider, *see N.J.R.E.* 404(b), and that its probative value was not unduly outweighed by any prejudice defendant might suffer from its introduction. *See, e.g., State v. G.V.,* 162 *N.J.* 252, 257–58, 744 *A.*2d 137 (2000); *State v. Marrero,* 148 *N.J.* 469, 482–84, 691 *A.*2d 293 (1997); *State v. Cofield,* 127 *N.J.* 328, 337–38, 605 *A.*2d 230 (1992). The judge also charged the jury appropriately on the limited use to which such evidence could be put. Thus, the credibility issue was well-framed for the jury and defendant was protected against improper use of the statement he had made. Sufficient other evidence implicating defendant in the crimes charged, emanating from witnesses subject to cross-examination, was also before the jury. Thus, the convictions cannot be said to have been based on hearsay evidence or impermissible police opinion testimony to an extent warranting our intervention.

We granted defendant's petition for certification, 191 *N.J.* 315, 923 *A.*2d 230 (2007), and, for the reasons that follow, we reverse the judgment of the Appellate Division, vacate defendant's convictions and sentence, and remand the cause to the Law Division for a new trial.

## II.

Defendant attacks his convictions on three fronts. First, he asserts that the testimony concerning the McMiller robbery the night before the Santiago murder and the references in defendant's confession concerning his having engaged in a series of robberies the day before the Santiago murder constituted impermissible "other crimes" evidence that should have been barred under *Evidence Rule* 404(b). Second, he argues that the police officers' explanation of the reasons they identified defendant as a suspect were improperly admitted hearsay. Lastly, he urges that

the police officers' testimony that defendant had not been truthful before confessing also was admitted improperly.

The State rejoins that the evidence of defendant's participation in robberies just hours before the Santiago murder was properly admitted under *Evidence Rule* 404(b) to show defendant's intent and motive and that, in any event, that evidence is admissible as part of the *res gestae*. The State also responds that the testimony of Det. Gregory concerning his course of conduct was based on "information received" and that all of the witnesses who provided that "information" testified during defendant's trial and, thus, were subject to cross-examination. Finally, the State asserts that it was proper for Det. Gregory to characterize as untruthful defendant's explanation before he abandoned that explanation and confessed.

We address these issues in the order in which they are raised by the parties.

### III.

Defendant contends that the evidence concerning the McMiller robbery, as well as the references in his confession in respect of that robbery should not have been admitted in his trial for the Santiago robbery and murder. To the extent defendant challenges the admission of evidence concerning the McMiller robbery, which occurred at least eight hours before the Santiago robbery and murder, we agree that its admission was reversible error.

### A.

The State asserts that the evidence of the McMiller robbery the night before the Santiago robbery and murder was admissible as *res gestae*. The trial court rejected that assertion, as do we. We have explained that "[t]he ancient *res gestae* concept, now codified in *N.J.R.E.* 803(c)(3) and referred to as the state of mind exception, covers 'statement[s] made in good faith of the declarant's then existing state of mind, emotion, sensation or

physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health)[.]' " *State v. Long*, 173 *N.J.* 138, 153, 801 *A.*2d 221 (2002) (quoting *N.J.R.E.* 803(c)(3)). We have noted that, "[d]espite the urging of some to abandon the use of the principle denominated as *res gestae,* courts continue to cling to it." *Ibid.* (citations, internal quotation marks and editing marks omitted). Therefore, "[d]espite its hearsay character, *res gestae* evidence is considered reliable because the surrounding circumstances guarantee its trustworthiness." *Id.* at 154, 801 *A.*2d 221.

The evidence concerning McMiller's robbery the night before the Santiago robbery and murder cannot be part of the *res gestae* of an indictment that exclusively addressed the Santiago robbery and murder. Nothing about the evidence given by McMiller as a victim, or by Flores or Lopez as corroborating witnesses, bears a sufficient nexus to the Santiago robbery and murder to justify its admission as *res gestae:* that evidence addresses a stand-alone crime neither charged nor referenced in the indictment against defendant and it does not speak to defendant's "then existing state of mind, emotion, sensation or physical condition" over eight hours later. Therefore, to the extent the State contends that the McMiller robbery evidence was admissible as part of the *res gestae* of the Santiago robbery and murder, that contention is rejected.

### B.

■ The trial court, however, admitted the evidence of the McMiller robbery as permissible "other crimes" evidence under *Evidence Rule* 404(b). For the reasons that follow, we conclude that the trial court abused its discretion in so ruling and that such error was not harmless.

*Cofield* supplies a four-part test governing the admissibility of "other crimes" evidence under *Evidence Rule* 404(b):

1. The evidence of the other crime must be admissible as relevant to a material issue;

2. It must be similar in kind and reasonably close in time to the offense charged;

3. The evidence of the other crime must be clear and convincing; and

4. The probative value of the evidence must not be outweighed by its apparent prejudice.

[*Supra,* 127 *N.J.* at 338, 605 *A.*2d 230 (citation omitted).]

More recently, we have refined this analysis, noting that "[t]he requirement set forth as prong two of *Cofield,* however, is not one that can be found in the language of *Evidence Rule* 404(b)." *State v. Williams,* 190 *N.J.* 114, 131, 919 *A.*2d 90 (2007). For that reason, "*Cofield'*s second prong . . . need not receive universal application in *Rule* 404(b) disputes [because i]ts usefulness as a requirement is limited to cases that replicate the circumstances in *Cofield.*" *Ibid.*

Applying *Cofield'*s first prong, the trial court ruled that "[t]he charges here are conspiracy and felony murder. Therefore the State must show there was an agreement or a plan and a predicate act of robbery. I find this testimony is relevant to show intent and motive as to the issue of robbery." In respect of *Cofield's* second prong—that the evidence "must be similar in kind and reasonably close in time to the offense charged"—the trial court also concluded that the State had met its evidentiary burden. It reasoned that

[t]he testimony puts the defendant in the area the night before engaged in street robberies similar to what is alleged was the predicate act which resulted in the victim's death. Defendant has, according to the witnesses, a sharp object, a knife. There's some dispute as to whether it's straight, whether it's curved, but he had a knife the night before. He displays it to Flores and Lopez, makes certain statements to them about them being lucky [he] knows them. McMiller testifies as to a sharp object being put to her [throat]. All of which occurs the night before. Again, you have the defendant's statement as to what he was out there doing the night before, I find that they're clearly similar in kind, and close in time.

The trial court also concluded that "when you look at all the evidence . . . there is clear and convincing evidence of robberies occurring and the defendant participating in those robberies the night before[,]" thus satisfying *Cofield'*s third prong. Finally, the trial court concluded that the McMiller robbery "evidence is highly probative for a lot of reasons, not the least of which is the defendant's general denial[,]" thus meeting *Cofield'*s last prong—

that "[t]he probative value of the evidence must not be outweighed by its apparent prejudice."

Even if we disagreed with the trial court's evidentiary determinations that the McMiller robbery evidence met the second, third, and fourth prongs of *Cofield*, we nonetheless do not find that it abused its discretion in respect of those determinations. *See Hisenaj v. Kuehner*, 194 *N.J.* 6, 12, 942 *A.*2d 769 (2008) ("In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion"); *Brenman v. Demello*, 191 *N.J.* 18, 31, 921 *A.*2d 1110 (2007) ("Because the determination made by the trial court concerned the admissibility of evidence, we gauge that action against the ... abuse of discretion standard"). However, we do conclude that the trial court abused its discretion when it determined that the McMiller robbery evidence satisfied *Cofield*'s first prong because it was "relevant to show intent and motive as to the issue of robbery."

Nothing in the facts or circumstances of the McMiller robbery is relevant to the specific charges that remained pending against defendant: the robbery, conspiracy to rob, and felony murder of Santiago. The McMiller robbery—a forcible purse-snatching by only one actor—was factually dissimilar to the Santiago robbery and murder. Other than demonstrating that defendant committed a robbery the night before, the McMiller robbery evidence does not speak to whether defendant and his accomplice agreed together to rob Santiago or whether Santiago was murdered in the course of that robbery.

Furthermore, we cannot conclude that this error was harmless, that is, that the McMiller robbery evidence "was 'too insignificant to have had any bearing' on the trial[.]" *State v. Reid*, 194 *N.J.* 386, 405–06, 945 *A.*2d 26 (2008) (quoting *State v. Hunt*, 91 *N.J.* 338, 350, 450 *A.*2d 952 (1982)). In determining whether the admission of disputed evidence was harmless, we focus on "whether in all the circumstances there was a reasonable doubt as to whether the error denied a fair trial and a fair decision on the merits[.]" *State v. Macon*, 57 *N.J.* 325, 338, 273 *A.*2d 1

(1971). *See also State v. Sanchez*, 129 *N.J.* 261, 278–79, 609 *A*.2d
400 (1992) (defining error as not harmless when the reviewing
court is "uncertain whether the error may have contributed to
defendant's conviction"). The application of that standard is
stated plainly:

> We will disregard any error or omission by the trial court unless it is of such a
> nature as to have been clearly capable of producing an unjust result. The same
> ultimate standard applies whether the error was objected to below or whether the
> error was first claimed upon appeal.
>
> [*State v. Castagna*, 187 *N.J.* 293, 312, 901 *A*.2d 363 (2006) (citations, internal
> quotation marks and editing marks omitted).]

The evidence arrayed against defendant in respect of the Santi-
ago robbery and murder was largely limited to his confession;
there were no eyewitnesses or independent forensic proofs that
directly tied defendant to the Santiago robbery or murder. In
those circumstances, defendant was tried on a robbery—the
McMiller robbery—for which a grand jury had not returned an
indictment and for which he did not stand charged.[10] The only
nexus between the McMiller robbery and the Santiago robbery
and murder was that they were close in time and location. Thus,
the McMiller robbery evidence was offered solely for the purpose
of claiming that, having committed the McMiller robbery, certainly
there could be no doubt that defendant also committed the Santia-
go robbery and, hence, was liable for Santiago's death, a rationale
*Evidence Rule* 404(b) specifically is designed to interdict. There-
fore, on the present record, where the proofs other than the
McMiller robbery evidence consisted largely of defendant's confes-
sion—a confession he repudiated at trial—the admission of the
McMiller robbery evidence may have been a significant contribut-
ing factor leading to defendant's convictions. That conclusion
admits of but one result: defendant's convictions must be reversed
and the matter retried.

---

[10] The record does not reveal whether defendant was ever charged with the
McMiller robbery.

## C.

■ Defendant also claims that the trial court's failure to redact his confession beyond the redactions agreed to by the parties also implicates *Evidence Rule* 404(b) concerns, as that confession covers other crimes that should have been withheld from the jury. We disagree.

There are four passages from defendant's confession defendant claims should have been redacted; these are:

Q. Where did you get the knife from?

A. From a dude that I robbed Sunday night.

. . . .

Q. Prior to trying to rob the old man [Santiago,] what were you doing?

A. Roaming around trying to find someone to rob.

Q. Were you and the other guy roaming that area all night looking for someone to rob?

A. Yes.

. . . .

Q. What area did you and him do the robberies?

A. In the area of Brunswick Street, Parkhurst and Pennsylvania Ave.

Q. Is that the same area that you and the guy encountered the old man [Santiago]?

A. Yes.

. . . .

Q. Do you remember how many people you robbed?

A. Like three people. But it may be more because me and the other guy separated Sunday night for a while.

The trial court held that defendant's confession qualified as a statement of a party-opponent, admissible pursuant to *Evidence Rule* 803(b)(1).[11] It reasoned that "the State [ma]y introduce at

---

[11] *Evidence Rule* 803(b) provides that "[i]n a criminal proceeding, the admissibility of a defendant's statement which is offered against the defendant is subject to *Rule* 104(c)[,]" which latter *Rule* requires that the admissibility of a criminal

trial any relevant statement[ and that t]he contents of the statement are clearly relevant to this case on several issues. They [ ] address issues of motive, of intent, participation, and of conspiracy [ ] as it relates at the very least to the robbery." The trial court also explained that under *Evidence Rule* 404(b), *State v. Covell,* 157 *N.J.* 554, 725 *A.*2d 675 (1999), "and the balancing test that that case deal[t] with[,]" it was required "to determine if the probative value [of the evidence] is substantially outweighed by the risk of undue prejudice." It noted that "[c]learly the admission[s] of the defendant in these statements are prejudici[al]. However, they would appear . . . to be highly probative of the issues of motive, intent, conspiracy, and participation." It thus concluded that defendant's confession "is clearly probative and [its] probative value is not . . . substantially outweighed by the risk of undue prejudice."

Our review of defendant's confession in the context of the crimes charged leads us to conclude that there was no abuse of discretion in the trial court's evidentiary determination to admit defendant's confession. *Hisenaj, supra; Brenman, supra.* As the trial court noted, defendant was charged with the robbery, conspiracy to rob, and felony murder of Santiago. All of the statements in the confession challenged by defendant directly addressed those charges: where defendant procured the knife used to murder Santiago; defendant's and his accomplice's intent to rob their victims; the location chosen by defendant and his accomplice to engage in those robberies; and the aggregate number of people defendant robbed during this two-day spree. Therefore, to the extent defendant challenges the admission of his confession at trial, that challenge is rejected.

---

defendant's statement must be made outside the presence of the jury and that the State bears "the burden of persuasion as to the admissibility of the statement[.]" *Evidence Rule* 104(c). The trial court's determinations in respect of the admissibility of defendant's confession were made in the context of a *Rule* 104(c) hearing held before trial started and, hence, outside the jury's presence.

## IV.

■ Defendant also claims that the trial court improperly allowed Det. Gregory to testify as to information he received in the course of his investigation that led him to focus on defendant as a suspect. At the outset, defendant's claim must be placed in its proper context.

Originally claiming that he had played no part in the Santiago robbery and murder, defendant claimed that he had been robbed while waiting at a bus stop in Hillside and that those injuries—where he was a victim—resulted in the blood on his clothes. Det. Gregory explained that, in the course of securing defendant's confession, the police had debunked that excuse and the following exchange ensued:

> A. .... Once we established, besides [defendant] indicating that he was in Hillside when he was robbed at a bus stop, he indicated that he was in the area of 37 Brunswick at the time in question. And then we went right into the Q and A and formalizing the *Miranda* and so forth.
>
> Q. So, in other words, he started by telling you he had been robbed in Hillside?
>
> A. Right.
>
> Q. And then he changed that?
>
> A. He, after we realized, based on what we had already found out, that that wasn't the truth. So then he finally admitted he was at 37 Brunswick and at that point he indicated that—

Defense counsel objected and asked to be heard at sidebar, claiming that he was "objecting to the response because I think the response is conveying to the jury the impression that he [Det. Gregory] had relevant information that's being kept from them." The trial court suggested that the issue be addressed outside the presence of the jury.

Once the jury was excused, defense counsel explained the basis for his objection. He noted that "the investigator indicated he had some information which placed [defendant] at the scene at the time before speaking to [defendant]. And I'm not aware of any eye witnesses who place [defendant] at the scene and I was just wondering what this information was, that's all." Questioned by the trial court, Det. Gregory explained that the information he had

arose on October 1, 2001, the day of the Santiago robbery and murder and that defendant was not interviewed until the following day. He noted that the witnesses interviewed on October 1, 2001 had led Det. Gregory to defendant and to Tallmadge, defendant's girlfriend. He also noted that, on October 2, 2001 and immediately before interviewing defendant, he interviewed Tallmadge who stated that defendant had been at her apartment earlier the prior morning "cut up[,]" a fact consistent with the struggle Santiago had with his attacker earlier that day. Det. Gregory explained that the information he had when he confronted defendant came from Flores and Lopez—who had seen defendant with a knife the night before Santiago was murdered—and Tallmadge, who saw defendant bloody shortly after Santiago was murdered.

Having heard that explanation, defense counsel stated: "So this is information the jury already heard, so that's not a problem." Defense counsel made his point clearly: "Judge, just to clarify. If the prosecutor wants to go back into this information, I have no problem with that because I'm going to go into it because I think it's clearly coming in." After a colloquy, the trial court noted that Det. Gregory could be examined as to the investigative steps he took in narrowing in on defendant, but only as to "[w]hat his mind set was, why he believed [defendant] as a suspect. That's all." The prosecutor's follow-up questions were limited to that area and that area alone: what Det. Gregory knew that led him to focus on defendant as a suspect.

Defendant claims that "[t]he admission of specific hearsay evidence regarding other information inculpating [defendant] as a suspect denied him his right to due process of law and confrontation under both the United States and New Jersey Constitutions." In *State v. Bankston*, 63 *N.J.* 263, 268, 307 *A.2d* 65 (1973) (citations omitted), we explained:

> It is well settled that the hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of the crime by stating that he did so "upon information received." Such testimony has been held to be admissible to show that the officer was not acting in an arbitrary manner or to explain his subsequent conduct.

More recently, in *State v. Branch*, 182 *N.J.* 338, 351, 865 *A.*2d 673 (2005), we noted that "[t]he common thread that runs through [the *Bankston* cases] is that a police officer may not imply to the jury that he possesses superior knowledge, outside the record, that incriminates the defendant."

The vice *Bankston* and its progeny seek to eradicate is the implication that a testifying police officer somehow is in possession of superior knowledge than what is presented to the jury and, hence, his testimony is worthy of greater weight. Here, defense counsel specifically stated that the State could inquire as to the bases for Det. Gregory's knowledge, explaining that he saw "no problem with that because I'm going to go into it because I think it's clearly coming in[,]" thus invoking the application of the invited error doctrine. *State v. Lykes*, 192 *N.J.* 519, 539 n. 7, 933 *A.*2d 1274 (2007) (citing *State v. Jenkins*, 178 *N.J.* 347, 358, 840 *A.*2d 242 (2004) (explaining that "a defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial[,]" and that "when a defendant asks the court to take his proffered approach and the court does so, we have held that relief will not be forthcoming on a claim of error by that defendant." (citations and internal quotation marks omitted))). Furthermore, all of the sources who led Det. Gregory to focus on defendant testified and were cross-examined at defendant's trial, thereby obviating defendant's Confrontation Clause claim. *See U.S. Const.* amend. VI; *N.J. Const.* art. I, ¶ 10, (providing that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him").[12]

---

[12] The only difference between the two constitutional provisions is that the federal constitution provides that "the accused *shall enjoy* the right ... [,]" whereas New Jersey's version provides that "the accused *shall have* the right...."

In sum, then, we find that the trial court did not abuse its discretion when it admitted Det. Gregory's testimony. Further, even if Det. Gregory's testimony implicated any of the concerns interdicted by *Bankston,* the totality of the circumstances presented leads to the conclusion that the admission of Det. Gregory's testimony in this respect was harmless. *See Macon, supra,* 57 *N.J.* at 336, 273 *A.*2d 1 (explaining that "not 'any' possibility can be enough for a rerun of the trial. The possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached"). That said, at defendant's retrial, it behooves the State to insure that Det. Gregory's testimony closely hews to *Bankston's* proscription and does not speak to whether defendant was "truthful."

## V.

Defendant's final claim is grounded in the same subject matter of the testimony by Det. Gregory raised in the prior point. Focusing on Det. Gregory's cross-examination testimony that he disbelieved defendant's explanation that he had received the cuts he displayed when he himself purportedly had been robbed at a bus stop in Hillside, defendant asserts, for the first time on appeal, that Det. Gregory's "repeated indications that the police believed that [defendant] lied about his injuries and ultimately believed that [defendant] was involved in the Santiago incident deprived [defendant] of due process of law and an impartial jury under both the United States and New Jersey Constitutions." Because we do not conclude that Det. Gregory's testimony in this respect rises to the level of plain error, we do not agree.

Although defendant elicited these responses on cross-examination, defendant objected to this area of Det. Gregory's testimony, but not for the reasons defendant now advances. In defendant's view, Det. Gregory's testimony that he did not believe that defendant's explanation for his cuts was truthful was based on the information he had received from other witnesses. Yet, at trial, defendant's sole concern was the basis for Det. Gregory's belief,

and *not* the statement that defendant's explanation was not the truth. This quandary was one of defendant's own making: defendant tendered a seemingly innocent explanation for his cuts, but that explanation was at odds with the facts as Det. Gregory had investigated them. Those two separate versions of the facts were mutually exclusive; one had to be true and the other false. Because, among other things, defendant had a far greater self-interest in his version of the facts, Det. Gregory concluded for his investigative purposes that defendant's version was not the truth, a conclusion confirmed by defendant's later abandonment of that claim in his confession.

On the whole, Det. Gregory did not express an opinion as to defendant's guilt and, in responding to questions on cross-examination, did not otherwise impermissibly impinge on the jury's exclusive province in respect of credibility determinations. *But see State v. Frisby*, 174 *N.J.* 583, 593–94, 811 *A.2d* 414 (2002) (finding improper police "essentially [giving] the jury their opinion regarding the innocence of [the witness] and inferentially the guilt of [the defendant]"). We therefore cannot conclude that admitting his testimony in respect of his skepticism concerning defendant's explanation was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result that it otherwise might not have reached." *State v. Feal*, 194 *N.J.* 293, 312, 944 *A.2d* 599 (2008) (citations, internal quotation marks and editing marks omitted). We, thus, reject defendant's challenge to Det. Gregory's testimony.

## VI.

The judgment of the Appellate Division is reversed, and the cause is remanded to the Law Division for further proceedings consistent with the principles to which we have adverted.

Justice ALBIN, concurring.

I concur in the resolution of this case. I write separately to express my belief that the time has come for this Court to

abandon its reliance on the discredited doctrine of res gestae—a doctrine that persists even though the reason for its existence has long since disappeared. Before the codification of our rules of evidence, res gestae had its place as part of our common law. Because the concepts embodied in res gestae are now codified in *N.J.R.E.* 404(b) and 803(c)(1)-(3), res gestae not only has outlived its usefulness, but seems to have no purpose other than as a means of evading the strict enforcement of our evidence rules. If res gestae is no more than the alter ego of *N.J.R.E.* 404(b) and 803(c)(1)-(3), then it adds nothing to our law of evidence. But if it is something more, then the result is that testimony inadmissible under the *New Jersey Rules of Evidence*, which may bear little relevance but create considerable prejudice, could be admitted under the fog of res gestae, a concept so formless that it allows almost any desired result.

Res gestae, which is Latin for " 'things done,' " "generally refers to words and/or actions that 'occur so close in time and substance' to each other that they are considered part of the same happening, event or transaction" at issue in a criminal or civil case. Chris Blair, *Let's Say Good-bye to Res Gestae*, 33 *Tulsa L.J.* 349, 349 (1997) (quoting *Black's Law Dictionary* 1305 (6th ed.1990)). As the doctrine of res gestae developed under the common law, it encompassed a number of exceptions to the hearsay rule—present sense impressions, excited utterances, and statements of then existing mental, emotional, or physical condition—which are now codified in our evidence rules as *N.J.R.E.* 801(c)(1)-(3). *State v. Long*, 173 *N.J.* 138, 166–67, 801 *A.2d* 221 (2002) (Stein, J., concurring in part, dissenting in part) (citing Blair, *supra*, 33 *Tulsa L.J.* at 349–50); *McCormick on Evidence* § 268, at 206–07 (Strong ed., 4th ed.1992). Res gestae also became a vehicle for introducing other bad-acts evidence that was deemed integrally related to the charged criminal episode and necessary to give it context. *Long, supra*, 173 *N.J.* at 167, 801 *A.2d* 221 (Stein, J., concurring in part, dissenting in part) (citing Blair, *supra*, 33 *Tulsa L.J.* at 350–51).

*N.J.R.E.* 404(b) now governs the admission of that type of evidence.[1]

Today, our codified evidence rules provide explicit formulas, adopted by this Court and the Legislature,[2] for the admission of testimony and physical items into evidence. The tests embodied in those rules are refined to ensure that the evidence is relevant and reliable—that is, trustworthy—and that its probative value sufficiently outweighs any prejudicial impact. For example, evidence offered under *N.J.R.E.* 404(b) must pass the rigorous test set forth in *State v. Cofield*, 127 *N.J.* 328, 338, 605 *A.*2d 230 (1992), and *State v. Williams*, 190 *N.J.* 114, 131–34, 919 *A.*2d 90 (2007). Evidence admitted under *N.J.R.E.* 404(b) must also be accompanied by a limiting instruction to the jury explaining that the evidence may only be considered for the purposes specifically delineated in *N.J.R.E.* 404(b). *See Williams, supra,* 190 *N.J.* at 133–34, 919 *A.*2d 90. We also have precise standards for the admission of such hearsay statements as present sense impressions or excited utterances as exceptions to the hearsay rule. *See N.J.R.E.* 803(c)(1)-(2); *State v. Branch*, 182 *N.J.* 338, 365–67, 865 *A.*2d 673 (2005) (defining elements of admissible excited utterances).

Unlike modern hearsay exceptions contained within the *New Jersey Rules of Evidence*, res gestae has no clearly delineated definition that allows one to easily determine whether a proffered piece of evidence is admissible under the doctrine. Moreover,

---

[1] *N.J.R.E.* 404(b) provides that

[e]xcept as otherwise provided by [*N.J.R.E.*] 608(b), evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

[2] The role of the Court and the Legislature in adopting and amending the *New Jersey Rules of Evidence* is described at *N.J.S.A.* 2A:84A–33 to –44.

because res gestae is a remnant of the common law, it appears that it is not subject to the procedural protections that inhere in our codified evidence rules. For example, in *State v. Martini*, 131 *N.J.* 176, 619 *A.*2d 1208 (1993), *overruled in part on other grounds by State v. Fortin*, 178 *N.J.* 540, 843 *A.*2d 974 (2004), the Court held that res gestae stands apart from the rule governing evidence of prior bad acts—now codified at *N.J.R.E.* 404(b). *Martini, supra,* 131 *N.J.* at 240–41, 619 *A.*2d 1208. Therefore, although we require that limiting instructions be given to the jury on the proper use of prior bad-acts evidence admitted under *N.J.R.E.* 404(b), no such limiting instructions are necessarily given to constrain the improper use of res gestae evidence. *Martini, supra,* 131 *N.J.* at 242, 619 *A.*2d 1208.

Although the trial court in this case did not rely on res gestae to admit the disputed evidence at issue before us, the State, anticipating that we might not allow in the evidence under any of the provisions of the *New Jersey Rules of Evidence*, now asserts res gestae as a separate ground for its admission. I do not blame the State for attempting an alternate route—res gestae—when the codified evidence rules do not allow for the admission of desired testimony. It is the responsibility of the judiciary to close off end-runs around the strictures of our carefully crafted, codified evidence rules. *See* Jerome A. Hoffman, *Res Gestae's Children,* 47 *Ala. L.Rev.* 73, 142 & n.383 (1995).[3]

As early as 1881, Professor James B. Thayer described res gestae as a " 'convenient obscurity' " and criticized it for its " 'intolerable vagueness.' " Blair, *supra,* 33 *Tulsa L.J.* at 351–52 (quoting 6 *Wigmore on Evidence* § 1767 (Chadbourn rev. ed.1976)). In 1944, Judge Learned Hand observed that res gestae

---

[3] An Alabama trial judge appropriately highlighted that concern: " 'I could possibly let the testimony in under the legal phrase that lawyers like to talk about as res gestae, which means ... if you can't think of any other good reason to let something into evidence that's the one to try to travel under as an umbrella.' " *Heard v. State,* 351 *So.*2d 686, 689 (Ala.Crim.App.1977), *quoted in* Hoffman, *supra,* 47 *Ala. L.Rev.* at 143.

"is a phrase which has been accountable for so much confusion that it had best be denied any place whatever in legal terminology; if it means anything but an unwillingness to think at all, what it covers cannot be put in less intelligible terms." *United States v. Matot,* 146 *F.*2d 197, 198 (2d Cir.1944); *see also McCormick on Evidence, supra,* § 268, at 207 n.6 (citing Edmund M. Morgan, *A Suggested Classification of Utterances Admissible as Res Gestae,* 31 *Yale L.J.* 229, 229 (1922)).

I am not the first member of this Court to speak out against our continued acceptance of res gestae. I agree with Justice Stein's assessment in *Long, supra,* that "the Court would be better served by abandoning continued reference to the phrase *res gestae* and replacing it with the precise analysis contemplated by our Rules of Evidence." 173 *N.J.* at 170, 801 *A.*2d 221 (Stein, J., concurring in part, dissenting in part). Justice Stein cited two well respected treatises on evidence law, *Wigmore* and *McCormick*—perhaps the most respected ones in the field—for the proposition that res gestae is "archaic and largely superseded by specific exceptions set forth in the evidence rules." *Id.* at 167, 801 *A.*2d 221. He cited the following critique in *Wigmore*:

"The phrase res gestae has long been not only entirely useless, but even positively harmful. It is useless, because every rule of evidence to which it has ever been applied exists as a part of some other well-established principle and can be explained in the terms of that principle. It is harmful, because by its ambiguity it invites the confusion of one rule with another and thus creates uncertainty as to the limitations of both. It ought therefore wholly to be repudiated as a vicious element in our legal phraseology."

[*Id.* at 167–68, 801 *A.*2d 221 (quoting 6 *Wigmore on Evidence, supra,* § 1767).]

He also noted *McCormick's* suggestion that res gestae " 'be jettisoned, with due acknowledgment that it served an era in the evolution of evidence law.' " *Id.* at 168, 801 *A.*2d 221 (quoting *McCormick on Evidence* § 268, at 196 (Strong ed., 5th ed.1999)).

Other courts throughout the country have already come to the conclusion that res gestae is outdated, is no longer relevant, and should be discarded. *See, e.g., Stephens v. Miller,* 13 *F.*3d 998, 1003 (7th Cir.) (en banc), *cert. denied,* 513 *U.S.* 808, 115 *S.Ct.* 57, 130 *L.Ed.*2d 15 (1994); *Miller v. Keating,* 754 *F.*2d 507, 509 & n. 1

(3d Cir.1985); *Wheeler v. United States*, 211 *F*.2d 19, 23 n. 11 (D.C.Cir.1953), *cert. denied*, 347 *U.S.* 1019, 74 *S.Ct.* 876, 98 *L.Ed.* 1140 (1954); *State v. Gunby*, 282 *Kan.* 39, 144 *P*.3d 647, 661–63 (2006); *State v. Hafford*, 410 *A*.2d 219, 220–21 (Me.1980); *B & K Rentals & Sales Co. v. Universal Leaf Tobacco Co.*, 324 *Md.* 147, 596 *A*.2d 640, 644–45 (1991); *Bynote v. Nat'l Super Mkts., Inc.*, 891 *S.W*.2d 117, 121 (Mo.1995); *Horton v. State*, 764 *P*.2d 674, 677 (Wyo.1988); *see also State v. Hansen*, 296 *Mont.* 282, 989 *P*.2d 338, 352–54 (1999) ("The phrase res gestae, in itself, adds nothing but confusion to an already complex area of the law. The better practice is to abandon the use of the phrase altogether and to, instead, use the specific rule of evidence or statute that applies to the particular factual situation presented.").[4]

The Supreme Court of Hawaii recently joined that group of courts in recognizing the need to dispense with res gestae. In *State v. Fetelee*, 117 *Hawai'i* 53, 175 *P*.3d 709 (2008), that court noted that "certain concepts contained in the doctrine have been subsumed within the exceptions to the hearsay rules." *Id.* at 736. The court also looked to the legislative history behind *Haw. R. Evid.* 404(b)—which, like *N.J.R.E.* 404(b), limits the use as evidence of a defendant's other crimes or bad acts—and concluded that res gestae was "superseded by the adoption of" that rule. *Fetelee, supra,* 175 *P*.3d at 737. The court explained that allowing res gestae to survive "would be at odds with the legislative purpose of establishing the [*Hawaii Rules of Evidence*] as a singular and primary source where all evidence rules are rationally organized." *Ibid.* (citation and quotations omitted). On that basis, the court declared "that the *res gestae* doctrine is no longer a legitimate independent ground for admissibility of evidence."

---

[4] Other jurisdictions, however, continue to cling to res gestae as a viable doctrine. *See State v. Fetelee*, 117 *Hawai'i* 53, 175 *P*.3d 709, 724 (2008) (listing U.S. Courts of Appeals for the Fifth, Sixth, and Ninth Circuits, as well as high courts of Arkansas, Colorado, South Dakota, and Washington, as continuing to adhere to res gestae).

*Ibid.* The reasoning of the Hawaii Supreme Court applies with equal force here.

Res gestae is the moldy cardboard box in the basement, whose contents no longer have any utility but which we nevertheless fear discarding. The time has come for us to rid our evidence rules of this ancient doctrine that no longer has any contemporary relevance. With the proper record before us, I look forward to our Court visiting this important issue.

Justice LONG joins in this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO, HOENS—7.